UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | | |
|---|---|---|
| CHRISTINE DORRIBO | * | CIVIL ACTION NO. |
| | * | |
| Plaintiff, | * | JUDGE: |
| | * | |
| VERSUS | * | MAGISTRATE JUDGE: |
| | * | |
| BOARD OF SUPERVISORS FOR | * | |
| THE UNIVERSITY OF LOUISIANA | * | |
| SYSTEM, and | * | |
| JAMES T. GENOVESE, | * | |
| in his official capacity as President of | * | |
| Northwestern State University, | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **COMPLAINT**

1.      Plaintiff Christine Dorribo ("Dorribo") brings this lawsuit alleging unlawful employment discrimination on the basis of disability by officials of Northwestern State University ("NSU"). Dorribo files this complaint against the Board of Supervisors for the University of Louisiana System, which oversees NSU, and James T. Genovese, in his official capacity as President of NSU ("President Genovese") (collectively, "Defendants"). Dorribo seeks appropriate relief and compensation for harms resulting from Defendants' unlawful employment practices under Title I of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the Louisiana Employment Discrimination Law.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over the subject matter of Dorribo's claims in accordance with 28 U.S.C. § 1331 because she asserts claims that arise under federal law. The

Court may exercise supplemental jurisdiction over her state law claims in accordance with 28 U.S.C. § 1367(a) because they are so related that they form the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Dorribo's claims occurred in this judicial district.

## PARTIES

4. Dorribo is an individual with a "disability" as defined in 42 U.S.C. § 12102(1). She is also an "individual with a disability" as defined in 29 U.S.C. § 705(20). She is also a "person with a disability" within the meaning of La. R.S. 23:322(3).

5. Dorribo is a resident and domiciliary of Natchitoches Parish, Louisiana.

6. Named Defendant is the Board of Supervisors for the University of Louisiana System (the "Board"), the governing authority for Northwestern State University ("NSU"), a state university located in Natchitoches, Louisiana. The Board is domiciled in East Baton Rouge Parish. La. R.S. 17:1833.

7. Named Defendant is James T. Genovese, the President of NSU. President Genovese serves as the decision maker and governing authority for NSU. On information and belief, he is domiciled in Natchitoches Parish. President Genovese is named solely in his official capacity as the President of NSU.

## DEFENDANTS' UNLAWFUL EMPLOYMENT PRACTICE

8. Dorribo was employed at NSU from August 2006 until December 2024. She worked as a librarian in the university library.

9. Dorribo has been diagnosed with and continues to live with certain mental health disorders. She has received treatment for these disorders for the entire time period relevant to this complaint.

10. In 2020, during the Covid-19 pandemic, NSU shifted the working location of all library employees, including Dorribo, to fully remote work. During this time, Dorribo's symptoms increased. Her symptoms include extreme anxiety, guilt, and shame due to the nature of her illness.

11. Nevertheless, for the entirety of the time relevant to this complaint, Dorribo performed her job as a librarian satisfactorily. Dorribo never received a negative performance evaluation from NSU.

12. In May of 2021, Dorribo applied for a long-term telework accommodation with NSU. She supported that request with documentation from her medical provider, explained that she had been able to successfully complete her duties remotely, and her disorder was debilitating. NSU agreed to an accommodation and allowed her to continue working remotely.

13. On September 26, 2022, NSU sent Dorribo a notice stating that she was required to report back to in-person work at the library by October 31, 2022. In that letter, NSU described the previously agreed-to reasonable accommodation for telework as a "temporary virtual assignment" that would end at that time.

14. Dorribo retained counsel to assist her. Her counsel wrote a letter dated October 25, 2022, to NSU's human resources director, requesting that NSU withdraw the demand for a return to in-person work, as Dorribo had been successfully performing her duties from home, needed to maintain the accommodation due to her disability, and NSU had not identified any changes in Dorribo's job duties to precipitate discontinuation of the telework accommodation.

Counsel further requested that, at minimum, NSU allow Dorribo to continue working remotely until the parties engaged in the interactive process to find the best means of accommodating Dorribo's disability.

15. Dorribo's accommodation request should have commenced the "interactive process," which is "a flexible, interactive process that involves both the employer and the individual with a disability," with a goal of reaching an agreement regarding an appropriate accommodation. 29 C.F.R., App. to Pt. 1630.

16. On February 8, 2023, the parties, accompanied by counsel, met to discuss Dorribo's request for reasonable accommodations. In that meeting, counsel for Dorribo requested additional information from NSU regarding what NSU considered to be the essential functions of her position. NSU also agreed to respond to her request for accommodation with a counterproposal.

17. In fact, NSU never responded to the request for an accommodation.

18. Counsel for Dorribo reached out repeatedly to NSU by phone and email through February and March of 2023, requesting the information NSU had agreed to provide, but NSU did not further respond. Nevertheless, NSU continued to permit Dorribo to work with the telework accommodation.

19. After NSU did not further respond, Dorribo reasonably believed the matter was resolved through a continuation of the previously agreed telework accommodation.

20. More than six months later, on August 28, 2023, NSU counsel emailed Dorribo's counsel to state that NSU had no more remote work available for her and that the parties "need[ed] to bring this matter to conclusion." Through follow-up email correspondence,

Dorribo's counsel responded and requested that before meeting, NSU provide the information previously requested in February.  NSU did not provide the information.

21. On September 5, 2023, counsel met by phone for the purpose of discussing Dorribo's request for accommodations. In that meeting, counsel for Dorribo reiterated the request for information and request for a counterproposal to the work from home accommodation. In response, NSU through counsel declined the accommodation, stating that Dorribo needed to return to work because "it's [her] job," and concluded that Dorribo would be receiving a return-to-campus letter from NSU.

22. Having not received any further communication from NSU, on September 20, 2023, counsel for Dorribo emailed NSU again to follow up on the September 5 meeting. Again, counsel for Dorribo received no further response from NSU.

23. Nevertheless, Dorribo continued to work successfully with her telework accommodation without issue for several more months.

24. On February 21, 2024, more than a year after the initial February 2023 meeting and nearly six months after the September 2023 phone call, NSU sent yet another return-to-campus demand. The letter was signed by NSU's president.  In the letter, NSU again failed to provide a counterproposal to Dorribo's accommodation request.  Instead, NSU asserted that "it has been made clear that anything short of full-time teleworking would be unacceptable accommodation" and that "the essential functions of the job . . . require a physical presence to process." The letter went on to state that NSU "undertook an extensive review of the position and essential functions of the job in its Library." However, neither the purported counterproposal nor the results of the purported extensive review were provided to Dorribo.

25. NSU's President further stated in his letter that "[f]lexible work hours can be considered upon your return to campus, but we cannot provide them as reasonable accommodations at this time." The letter did not explain why flexible work hours would be available in the future but not available at that time. The letter also referred to NSU's general return-to-work policy following the Covid-19 pandemic.

26. Counsel for Dorribo responded to NSU with a letter dated February 27, 2024. The letter provided a timeline of events to that point, explaining how NSU had failed to engage in the interactive process as required by law since February 2023, including NSU's repeated failures to respond to communications from counsel for Dorribo, refusal to answer her questions, and refusal to offer a counterproposal to her accommodation request. The letter further explained that NSU's assertion that Ms. Dorribo would not consider any accommodation short of full-time remote work was incorrect:

> It appears that the University decided that Ms. Dorribo was unwilling to consider any counterproposal and therefore declined to present any that it considered. This is not true, as evidenced by our repeated requests for a counterproposal, which would necessarily include something other than fully remote work. We would request that the University provide us with the accommodation proposal so that Ms. Dorribo can consider and the parties can have a real opportunity to engage in the interactive process.

The letter also requested that the University produce the information it had reviewed regarding Dorribo's position and its essential functions.

27. NSU responded with a letter dated March 1, 2024, repeating that remote work was not a reasonable accommodation but that NSU was "prepared to extend flexible working hours to reasonably accommodate your request." The letter did not respond to Dorribo's requests for information or for a real opportunity to engage in the interactive process.

28. Counsel for Dorribo again responded to NSU with a letter dated March 15, 2024. Dorribo's counsel noted that, among other things, NSU's response had failed to clarify necessary details about the purported flexible working hours. As an example, due to the nature of her disability, Dorribo experiences severe anxiety when working near others. Thus, it was essential for Dorribo to understand whether the university's "flexible working hours" would permit her to work at times when others were not present in the library.

29. The letter from Dorribo's counsel dated March 15, 2024, included a request for NSU to describe "the nature of the flexible working hours that the University may be able to offer" and further stated, "Ms. Dorribo is left to guess whether 'flexible hours' means her work schedule will require her to be physically present on campus only during times when the library is closed so she may work alone, or something else. She has reasonably asked that the University state its position on this clearly so that she can consider and respond."

30. NSU never responded to the March 15 letter or explained what it meant by "flexible working hours." Indeed, NSU never responded to any further communications from Dorribo's counsel.

31. Following NSU's lack of a further response and its lack of engagement in the interactive process, NSU required Dorribo to take leave, as she was unable to comply with NSU's return-to-campus demand due to the debilitating nature of her condition.

32. On August 2, 2024, counsel for Dorribo once again wrote to NSU, indicating that because NSU had failed to respond to the request for an accommodation or participate in the interactive process, Dorribo would proceed with an understanding that her request for a reasonable accommodation had been denied. NSU did not respond.

33. Dorribo was forced to use the remainder of her personal and sick leave.

34. NSU did not further respond to Dorribo's request for an accommodation.

35. On December 4, 2024, Dorribo received a letter of termination from NSU.

36. NSU did not engage in a good-faith interactive process, leading to a failure to reasonably accommodate Dorribo.

37. NSU's refusal to engage in the interactive process violated its obligations under federal and state law. For example, EEOC guidance explains that when an individual with a disability has requested a reasonable accommodation to assist with the performance of a job, the employer should use a problem-solving approach that includes an analysis of the particular job and its purpose and functions; consultation with the individual to ascertain the precise job-related limitations and how those may be overcome with a reasonable accommodation; identification of potential accommodations and their potential effectiveness; and consideration of the preferences of the employer and employee. 29 C.F.R., App. to Pt. 1630. "Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

38. Defendants terminated Dorribo's employment based on her status as a person with a disability and failed to engage in an interactive process to provide reasonable accommodations for that disability.

39. Dorribo's conditions are mental impairments that substantially limit one or more of her major life activities, such that she is a person with a disability as defined under the ADA, the Rehabilitation Act, and the Louisiana Employment Discrimination Law.

40. Dorribo was, and is, fully qualified to continue serving in her librarian position. Until the time of her termination, she has been able to perform her duties from home, as indicated by her supervisor and performance evaluations.

## THE EFFECTS OF DEFENDANTS' UNLAWFUL EMPLOYMENT ACTION

41. As a result of Defendants' refusal to engage in the interactive process and Dorribo's ultimate termination, Dorribo has experienced lost wages, lost benefits, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms.

42. As a result of Defendants' refusal to engage in the interactive process and Dorribo's ultimate termination, Dorribo was forced to use FMLA leave and all her saved personal and sick leave. Dorribo has lost a job that she enjoyed and at which she excelled. She has been forced to look for alternative employment.

## DORRIBO'S EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES

43. Defendants' conduct in refusing to engage in the interactive process and the termination of Dorribo's employment is a violation of Dorribo's rights under the ADA, the Rehabilitation Act, and the Louisiana Employment Discrimination Law.

44. Dorribo timely submitted a charge to the EEOC. On December 13, 2024, the EEOC provided Dorribo a Notice of Your Right to Sue Letter. This suit is timely commenced within 90 days of Dorribo's receipt of the Notice letter.

45. Dorribo has exhausted the administrative remedies available to her. All conditions precedent to the institution of this suit have been fulfilled.

CAUSES OF ACTION

**Count 1: Violation of the Americans with Disabilities Act**
(42 U.S.C. § 12111 *et seq.*)

46.     Dorribo realleges and incorporates the allegations above as if fully set forth herein.

47.     Title I of the Americans with Disabilities Act ("ADA") provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

48.     Defendant, the Board of Supervisors of the University of Louisiana System, is a "covered entity" as defined by 42 U.S.C. § 12111(2).  The Board operates NSU and has more than 15 employees.

49.     Dorribo is a "qualified individual" within the meaning of 42 U.S.C. § 12111(8). At all times relevant to this action, with a reasonable accommodation, Dorribo has been able to perform the essential functions and duties of employment by NSU.

50.     The ADA further provides that discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

51.     At all relevant times, NSU employees have known that Dorribo is a person with a disability and yet have failed to provide a reasonable accommodation for that disability.

52. Once an employee has made a request for accommodations, the ADA's regulations state that the employer should initiate an informal, interactive process, to craft a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). EEOC guidelines stress that this process requires the input of both the employee and employer. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999). Courts have held that when an employer is unwilling to engage in good faith in the interactive process, and that leads to a failure to reasonably accommodate an employee, the employer violates the ADA. *Id.*

53. Defendants repeatedly failed to engage in the interactive process with Dorribo or her attorneys. Long periods of silence from Defendants, during which Dorribo continued to work remotely without issue, were interrupted by return-to-campus demands that did not address Dorribo's need for accommodations.

54. Defendants' refusal to participate in the interactive process after Dorribo requested reasonable accommodation, and their decision to ultimately terminate her employment, constitute unlawful discrimination and wrongful termination prohibited under 42 U.S.C. § 12112.

55. Dorribo has and continues to experience lost wages, lost benefits, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms as a result of Defendants' actions.

56. Dorribo requests that the Court issue judgment on her ADA claim declaring that Defendants violated Title I of the ADA in denying a reasonable accommodation to Dorribo and issuing an injunction directing Defendants to reinstate her to her position with a reasonable accommodation and to develop and implement policies to ensure that employees with disabilities who request a reasonable accommodation receive a meaningful opportunity to participate in the

interactive process for the purpose of facilitating that reasonable accommodation; and award her any other appropriate relief, including attorney fees and costs in accordance with 42 U.S.C. § 12205.

### Count 2: Violation of Section 504 of the Rehabilitation Act
(29 U.S.C. § 794 *et seq.*)

57. Dorribo realleges and incorporates the allegations above as if fully set forth herein.

58. The Rehabilitation Act provides, "No otherwise qualified individual with a disability, as defined, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

59. The Board of Supervisors for the University of Louisiana System receives federal financial assistance or funding. At all relevant times, Dorribo was employed in a program or activity receiving federal financial assistance or funding.

60. At all relevant times, Dorribo has a been qualified individual with a disability.

61. NSU had notice of Dorribo's disability.

62. Dorribo could perform the essential functions of her position with no more than a reasonable accommodation by NSU.

63. Dorribo requested a reasonable accommodation, but NSU denied her request.

64. Defendants' refusal to participate in the interactive process after Dorribo requested reasonable accommodation and their decision to terminate her employment constitute unlawful discrimination and wrongful termination prohibited under the Rehabilitation Act.

65. Dorribo has and continues to experience lost wages, lost benefits, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms because of Defendants' actions.

66. Dorribo requests that the Court issue judgment on her Rehabilitation Act claim by awarding her damages for back pay, lost wages, loss of benefits and retirement earnings and pension contributions, and any other damages available at law; declaring that Defendants violated the Rehabilitation Act in denying a reasonable accommodation to Dorribo and failing to engage in the interactive process; issuing an injunction directing Defendants to reinstate her to her position with a reasonable accommodation and to develop and implement policies to ensure that employees with disabilities who request a reasonable accommodation receive a meaningful opportunity to participate in the interactive process for the purpose of facilitating that reasonable accommodation; and award her any other appropriate relief, including attorney fees and costs.

**Count 3: Violation of the Louisiana Employment Discrimination Law**
(La. R.S. 23:322 *et seq.*)

67. Dorribo realleges and incorporates the allegations above as if fully set forth herein.

68. Dorribo is an individual with a disability as defined in La. R.S. 23:322.

69. At all times relevant to this action, Dorribo has been able to perform the essential functions and duties as a librarian while working from home.

70. Dorribo's filing a charge of discrimination with the EEOC satisfied the pre-suit notice requirement under La. R.S. 23:303(C). *See Miguel v. GEICO Gen. Ins. Co.,* 2016-0596, p. 4 (La. App. 4 Cir. 12/21/16), 207 So. 3d 507, 510.

71. Defendants' refusal to participate in the interactive process after Dorribo requested reasonable accommodation and their decision to ultimately terminate her employment constitute unlawful discrimination prohibited under La. R.S. 23:323.

72. Dorribo experienced lost wages, lost benefits, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms because of Defendants' actions.

73. Dorribo requests that the Court issue judgment on her claim arising under the Louisiana Employment Discrimination Law by awarding her damages for back pay and lost wages, lost benefits, loss of retirement earnings and pension contributions, mental anguish, and emotional distress; declaring that Defendants violated the Louisiana Employment Discrimination Law in denying a reasonable accommodation to Dorribo due to her disability; issue an injunction directing Defendants to reinstate her to her position with a reasonable accommodation and implement policies to ensure that employees with disabilities who request a reasonable accommodation receive a meaningful opportunity to participate in the interactive process for the purpose of facilitating that reasonable accommodation; and award her any other appropriate relief, including attorney fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Dorribo respectfully requests that this Court:

A. Order Defendants to reinstate Dorribo to her position as a librarian;

B. Award Dorribo appropriate lost wages, bonuses, benefits, and other compensation to which she would have been entitled but for Defendants' unlawful conduct;

C. Award Dorribo other affirmative relief necessary, including but not limited to back pay, to eradicate the effects of Defendants' disability-based discrimination;

  D. Award Dorribo compensation for the nonpecuniary damages she suffered as a result of Defendants' unlawful discriminatory actions described above, including damages for emotional pain and suffering, anxiety, stress, loss of enjoyment of life, humiliation, and other dignitary harms;

  E. Enter an injunction ordering Defendants to implement employment policies that ensure that employees who request a reasonable accommodation receive a meaningful opportunity to participate in the interactive process for the purpose of facilitating a reasonable accommodation;

  F. Award Dorribo costs and attorney fees;

  G. Award Dorribo prejudgment interest; and

  H. Provide such other relief as this Court deems just and proper.

Date: February 28, 2025       Respectfully submitted,

            */s/ J. Dalton Courson*
            J. Dalton Courson, La. Bar No. 28542, T.A.
            Roya Khosravi, La. Bar No. 39236
            Disability Rights Louisiana
            8325 Oak Street
            New Orleans, LA 70118
            (504) 522-2337
            (504) 522-5507 (fax)
            dcourson@disabilityrightsla.org
            rkhosravi@disabilityrightsla.org